UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
DEVON HILLMAN

|  |  |
|---|---|
| *Plaintiff,* | **Case No.** 5:24-cv-1448 (DNH/TWD) |

-against-

**COMPLAINT**

THE CITY OF OSWEGO, OSWEGO CITY POLICE
DEPARTMENT, SERGEANT TOM RUPERT,
INVESTIGATOR KEVIN HADCOCK, OFFICER STEPHEN
WEBER, OFFICER JOSHUA MARTIN, OFFICER JOHN
DOE #1, SERGEANT JOHN DOE #1, INVESTIGATOR
JOHN DOE #1, OFFICERS JOHN DOE#2-5, DISPATCHER
JOHN DOE individually and in their official capacities as
officers, sergeants, and dispatcher.

<u>JURY TRIAL DEMANDED</u>

*Defendants*
------------------------------------------------------------------------X

Devon Hillman ("Plaintiff") by his attorneys Anne LaBarbera Professional Corporation

respectfully alleges, upon information and belief:

## <u>PARTIES</u>

1.    Plaintiff DEVON HILLMAN was, and still is, an individual residing at, ███████████

Oswego, County of Oswego, State of New York, within this judicial district.

2.    Defendant THE CITY OF OSWEGO ("CITY") was, and still is, at all times relevant herein,

a municipal corporation duly incorporated and existing under and by virtue of the laws of the

State of New York. Defendant CITY is authorized by law to maintain a police department,

which acts as its agent in the area of law enforcement and for which it is ultimately

responsible.  Defendant City assumes the risks incidental to the maintenance of a police force

and the employment of police officers and sergeants as said risk attaches to the public

consumers of the services provided by the Oswego City Police Department ("OPD").

1

3.      Defendant CITY was, and still is, at all times relevant herein, a municipal corporation created and authorized under the laws of the State of New York. CITY is authorized to maintain a police department, which acts as its agent in the area of law enforcement and for which CITY is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.      Upon information and belief, Defendants Sergeant Tom Rupert, Investigator Kevin Hadcock, Officer Stephen Weber, Officer Joshua Martin, and officer John Doe #1 are employed as either sergeants, investigators, or police officers by the Oswego Police Department and are residents of the State of New York, County of Oswego.

5.      Defendants Sergeant Tom Rupert, Investigator Kevin Hadcock, Officer Stephen Weber, Officer Joshua Martin, and officer John Doe #1 are collectively referred to herein as the "Individual Defendants"[1].

---

[1] The full names, identities and contact information are within the sole possession of the defendants. Plaintiff alleges the names of Stephen Weber, Joshua Martin, Kevin Hadcock, and later Sergeant Tom Rupert upon information and belief though these names have not been provided to Plaintiff by defense counsel. Plaintiff was given the last names of these individuals over the phone the day after the incident. FOIL requests have been made and acknowledged but results for the identities of the officers have not been provided. Searches of public social media posts and news reports demonstrate Plaintiff's due diligence that these are the identities of some of the officers. Plaintiff reserves his right to substitute any mistaken party names and/or John Doe defendants.

6.     Defendants Sergeant John Doe, Investigator John Doe, and Officers John Doe #2-5 are used because the true names and numbers of Oswego Police Department employees involved in the actions and omissions as described herein are as yet unconfirmed.

## PROCEDURAL HISTORY

7.     On January 23, 2024, and within the time prescribed by law, a sworn Notice of Claim stating, among other things, the time when and the place where the injuries and damages were sustained, together with Plaintiff's demands for adjustment thereof was duly served on Plaintiff's behalf on the City Clerk of Defendant CITY and that, thereafter, said City Clerk for **CITY** refused or neglected for more than thirty (30) days, and up to the commencement of this action, to make any adjustment or payment thereof, and that, thereafter, and within the time provided by law, this action was commenced.

## CONDITION PRECEDENT

8.     The CITY held a 50-h hearing on March 14, 2024.

9.     More than thirty (30) days have elapsed since service of said Notice of Claim and the City has failed to pay or adjust the claim.

10.    The action herein was brought within a year and 90 days of the event that gives rise to Mr. Hillman's causes of action under New York State law and Plaintiff has complied with all of the statutory prerequisites for bringing this action.

## JURISDICTION

11.    As Plaintiff alleges that the Defendants violated his rights guaranteed by the Constitution of the United States, this Honorable Court has jurisdiction by and through 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution.

Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3)&(4) and the aforementioned statutory and constitutional provisions.

12.     As Plaintiff alleges that Defendants violated his rights guaranteed under the Laws of the State of New York, this Honorable Court has jurisdiction over those claims arising under the Laws of the State of New York by and through 28 U.S. § 1367(a).

## **VENUE**

13.     The underlying events took place within the City of Oswego, in the County of Oswego, within this judicial district. Venue is proper in this Court.

## **FACTS**

14.     On or about December 1, 2023 ("the date of incident"), Plaintiff Devon Hillman was lawfully present at a garage owned by the estate of his recently deceased father in order to remove some of his father's personal items for the purpose of estate business.

15.     The garage was located at 113 East 9th Street, Oswego, NY 13126.

16.      Plaintiff had the right, and fiduciary duty, to enter the garage as next of kin and the only heir resident in the State of New York.

17.     Plaintiff and his sister were the sole heirs to Plaintiff's father who passed away on or about November 16, 2023.

18.     Plaintiff planned to enter the garage with the knowledge and consent and at the request of his sister, for purposes related to estate business.

19.     When Plaintiff first tried to enter the garage, he discovered an unfamiliar lock that prevented him from entering the garage, which was in the Plaintiff's legal possession.

Previous Incident

20.    This was at least the second time Plaintiff arrived at the garage for the purposes of estate business to find an unfamiliar lock placed by a then unknown Suspect who was attempting to take possession of and exercise dominion over the assets of the estate of Plaintiff's deceased father.

21.    On this previous occasion just days earlier CITY Police Officers were called to the scene by an Accomplice of the Suspect when Plaintiff gained access to the garage for the purposes of estate administration.

22.    On that occasion CITY officers informed the Accomplice that she was not to interfere with Plaintiff's access to the garage.

23.    Upon information and belief, the Suspect was also contacted and told not to interfere with the estate assets or Plaintiff's access to them.

24.    Plaintiff was told that if he had further difficulties with access to the garage he was to call police to inform them.

The Civil Dispute

25.    Accomplice rented the house at 113 East 9th Street, Oswego, NY 13126 on an informal periodic lease arrangement that she had with Plaintiff's father prior to his passing.

26.    That informal agreement included occupancy of the first floor of the home alone.

27.    Plaintiff's father retained sole occupancy of the garage where he stored his possessions as he lived in a large van.

28.    Accomplice perceived Plaintiff as a landlord because Plaintiff, along with his sister, was to inherit the property at 113 East 9th Street, Oswego, NY 13126.

29. Accomplice was in an ongoing civil dispute with the estate due to the planned sale of the property at the time that she assisted Suspect in exercising dominion over the assets of the estate located in the garage at the property and on both occasions that she called for police assistance in that nefarious undertaking.

30. There is no legal theory upon which Suspect could have conceivably claimed a right to the garage or its contents and he had been told this by police days earlier.

<u>The Events of December 1, 2023</u>

*The False Report*

31. Plaintiff was the only one authorized by the estate to place a lock on the garage [2].

32. On December 1, 2023, Plaintiff arrived at the garage to find an unfamiliar lock on the garage for at least the second time in days.

33. Plaintiff gained access to the garage by kicking the door in.

34. Plaintiff requested of Accomplice, and was granted, access to the home briefly to access the circuit breakers in the basement that could not be accessed by the garage.

35. Accomplice had words with Plaintiff, expressing an incorrect opinion that Plaintiff had no right to access the garage.

36. Plaintiff made it clear that Plaintiff did have the right to enter the garage.

37. Plaintiff had no choice but to kick in the door to access the garage because Plaintiff did not have a key to the lock placed on the door unlawfully by Suspect.

---

[2] Plaintiff's father died without a Will.  Upon information and belief, Plaintiff and his sister are the sole heirs to the estate of Plaintiff's father.  Plaintiff entered the garage with his sister's knowledge and consent.

38.   After entering the garage by kicking in the door, Plaintiff feared Accomplice would make a second false report as Accomplice did just days earlier.

39.   As instructed, Plaintiff called CITY police for assistance in preventing Accomplice from interfering with estate assets.

40.   Plaintiff connected to Dispatcher and explained the situation. Plaintiff also explained that Accomplice was likely to make a false report against Plaintiff.

41.   Dispatcher John Doe asked Plaintiff to go to his car and wait for police to arrive.

42.   Plaintiff complied with these instructions by getting into his car to wait for CITY officers to arrive.

*Initial Police Misconduct*

43.   Approximately 3 or 4 minutes after the call, CITY officers, Stephen Weber (hereinafter "Weber"), Joshua Martin (hereinafter "Martin"), John Doe #1 , and Investigator Kevin Hadcock (hereinafter "Hadcock"), appeared at Plaintiff's car in which he was still sitting.

44.   Weber, Martin, Hadcock, and John Doe #1 are collectively referred to herein as "the Officers".

45.   The Officers arrived in more than one fleet vehicle with lights and sirens engaged.

46.   The Officers surrounded Plaintiff and pointed Tasers at him.

47.   One or more of the Officers demanded that Plaintiff get out of his car. Plaintiff complied.

48.   The Officers had Tasers drawn when they ordered Plaintiff to exit his car or shortly thereafter.

49.   As the Officers approached, it was raining moderately.

50.   Within minutes all of the Officers were in a formation around Plaintiff.

51.   Plaintiff was unable to see the officers' badges or names due to a policy that does not require that this information be displayed while on duty.

7

52.    One or more officers used Plaintiff's first name to address him, appearing to know Plaintiff's identity before having to ask.

53.    There was no probable cause or reasonable suspicion to believe that Plaintiff had committed any crime.

54.    There was no reasonable suspicion or probable cause to believe Plaintiff was a suspect in a crime as Plaintiff was found in his car where he was asked by Dispatcher John Doe to wait for police assistance.

55.    Plaintiff began to record the encounter on a mobile device expressing an explicit belief that his rights had been and were being violated and announcing his intention to preserve evidence of the encounter.

56.    Plaintiff made no attempt to leave the scene and expressed an interest in discussing the matter fully with the Officers stating, "Can we go talk somewhere outside of the rain?".

57.    Plaintiff repeatedly made the Officers aware that it was he who had called to report the illegal actions of the Suspect and the Accomplice.

58.    Plaintiff complied with every lawful request made by the Officers.

59.    Plaintiff repeatedly explained to the Officers that he was the one who called dispatch begging for police assistance.

60.    Plaintiff repeatedly informed the Officers that he had complied with instructions of dispatch to wait in his car.

61.    Plaintiff repeatedly requested that the Officers call dispatch to confirm the information.

62.    Plaintiff complied with Hadcock's order to move closer to Hadcock.

63.    Hadcock then gave an unlawful demand that Plaintiff turn around to be detained.

8

64.    Hadcock said "Turn around, turn around.  Devon, you're gonna be detained until we sort it out.".

65.    The Officers wrongly continued to treat Plaintiff as a "suspect" rather than confirming that he was the one who actually called dispatch for help.  Plaintiff was the victim, not the suspect!

66.    Officers then began to approach Plaintiff.

67.    Plaintiff was again candid with the Officers that he intended to pursue redress for the violations of his civil rights that had already occurred.

68.    Officers Weber and Hadcock exchanged a look with each other as they walked toward Plaintiff.

69.    Plaintiff asked the Officers to bring a sergeant to the scene.

70.    In response to the request for a sergeant, the Officers suddenly lunged towards Plaintiff, assaulting him violently.

71.    The Officers took Plaintiff into physical custody by assaulting Plaintiff and throwing him violently to the ground, placing him in handcuffs once he was on the ground.

72.    As Weber approached Plaintiff, he was positioned to the front and left of Plaintiff (from Plaintiff's perspective).

73.    Weber kicked across Plaintiff's body to kick Plaintiff's right lower leg hard enough to knock Plaintiff's right leg in the air then quickly moved around behind Plaintiff to place his knee on Plaintiff's Achillies tendon area, pinning it to the pavement.

74.    Plaintiff's right arm was being restrained by Officer Martin as Weber kicked Plaintiff's right foot into the air and pinned his left foot.  Weber held Plaintiff's left arm.

75.    As Plaintiff started to lose balance and fall, he was unable to place his left knee on the pavement because Weber had a knee on Plaintiff's Achillies tendon.

76.    As Plaintiff fell, Officers Weber and Martin held onto his arms until seconds before he landed on the pavement.  Officer Hadcock grabbed Plaintiff's shoulder from Plaintiff's front as he fell.  The combination of these three officers' actions prevented Plaintiff from using his arms to break his fall.

77.    This caused Plaintiff's right knee to contact the street pavement with force before any other part of his body did.

78.    Plaintiff attempted to place his left foot on the pavement to steady himself but was unable to prevent his right knee from striking the pavement with enough force to injure him due to the intentional actions of Weber, Martin, and Hadcock.  Plaintiff's left foot came out of his left shoe as he fell.

79.    The Officers descended on Plaintiff, pinning him down and placing him in handcuffs.

80.    Shortly after placing Plaintiff in handcuffs, Weber picked up Plaintiff's mobile device and stopped it from recording.

81.    The Officers subjected Plaintiff to custodial interrogation as he repeatedly informed the Officers that he was the one who called the police and had the legal right to enter the garage.

82.    During the encounter the Officers repeatedly refused to remove handcuffs from Plaintiffs hands but denied that Plaintiff was under arrest.

83.    The Officers refused to remove the handcuffs from Plaintiff for approximately 25 mins while claiming that Plaintiff was not under arrest, rather detained.

84.    During the entire encounter the Officers failed and refused to confirm with Dispatcher John Doe that Plaintiff himself had called in to report, for the second time in days, a crime committed by Suspect with the assistance of Accomplice.

*Misconduct Continues After Sergeant Arrives*

85.     Approximately ten minutes into the encounter, Sergeant Tom Rupert (hereinafter "Rupert")

        arrived at the scene.

86.     Weber asked Martin and John Doe #1 to put Plaintiff into a police vehicle which they did

        against the express wishes of Plaintiff.

87.     Weber followed Rupert toward the house at 113 East 9th Street, Oswego, NY 13126 to join

        Hadcock, who was already inside speaking with Accomplice.

88.     Shortly thereafter Weber communicated with the Sergeant thusly:

            Sergeant: "Are they just getting him outta here?"

            Weber: "We don't know what we have yet but he's being a complaining asshole."

89.     The conversation clearly implies a lack of probable cause or reasonable suspicion and implies

        a motive of revenge for keeping Plaintiff in custody unlawfully.

90.     With clear disregard for Plaintiff's rights Rupert made statements to the effect that he didn't

        care what the Officers did with Plaintiff.

91.     Rupert and Weber then went into the house at the property to speak with the Accomplice who

        was already speaking with Hadcock.

92.     For approximately ten to fifteen minutes after the violent assault, Weber, Hadcock and Rupert

        worked together, at times with the active participation of the Suspect and Accomplice to

        manufacture a legal theory upon which Plaintiff could have been the perpetrator of a crime

        for entering the garage.

93.     At one point during this time Rupert made a phone call to an unknown person and appeared

        to be brainstorming theories upon which Plaintiff may have committed a crime.

11

94.     During this exchange the Accomplice clearly laid out the civil dispute that motivated the Accomplice to make two false reports against Plaintiff within days of each other.

95.     At the suggestion of the Accomplice, Hadcock called the Suspect and engaged in a polite discussion with Suspect.

96.     In his discussion with Suspect, Hadcock attempted to establish a legal theory upon which the Suspect could press charges against Plaintiff.

97.     At one point during this bizarre consultation with the Accomplice, the mother of Plaintiff walked past a window towards the garage and the Accomplice said "I don't want her in my house at all." Plaintiff's mother was moving towards the garage, not the house occupied by the Accomplice.

98.     The Accomplice further shared a malicious opinion about Plaintiff's mother. The Accomplice stated "She's not a nice person." and followed with "I do not want to deal with her."

99.     Plaintiff's mother knew that the Suspect had no right to lock Plaintiff out of the garage and shortly after arriving at the scene stated this to police.

100.    The Accomplice disclosed an additional malicious motive for the false report during the consultation.

101.    Recalling that she lost her home when her own husband died, Accomplice expressed malicious bitterness that Plaintiff's mother might claim a right to the estate of Plaintiff's father.

102.    None of this was in any way the business of the Suspect or the Accomplice.

103.    Hadcock discussed and theorized with Accomplice the rights that Plaintiff's mother might have given that she was not married to Plaintiff's father at the time of his death.

12

104.    Police suggested to Accomplice that Plaintiff didn't have the right to come into her apartment under any circumstances despite the fact that Accomplice admitted that she gave Plaintiff permission to enter for the legitimate purpose of checking the breakers.

105.    At no time during this conversation did Rupert and the Officers treat the Accomplice as a suspect despite the earlier false report and suspicious behavior on display during the consultation.

106.    The Accomplice never had a Taser pointed at her, nor was she put in handcuffs, detained, or arrested.

107.    During this time Plaintiff was in handcuffs being treated as a suspect without probable cause or reasonable suspicion as Martin and John Doe #1 were attempting to put Plaintiff in a police vehicle.

108.    Suspect was wrongly treated as if he was the owner of the property, politely invited to fix and replace the door.

109.    Out of apparent desperation in an attempt to manufacture a crime to justify their unlawful treatment of Plaintiff, the police theorized that Plaintiff might have been stealing from the estate to prevent his sister from taking her part of the estate under intestate succession.

110.    Eventually the officers ran out of outrageous theories upon which they could justify their actions and the Accomplice was told Plaintiff had done nothing wrong.

111.    The Accomplice was not treated as a suspect either for false report, or for assisting the Suspect in taking possession of Plaintiff's property despite having been told that she was not to interfere with Plaintiff's property rights days earlier when she made the first false report.

112.    By this time Plaintiff had been placed in an ambulance for initial treatment for the knee injury.

113.    Finally, police removed the handcuffs and released Plaintiff from custody approximately 25 to 40 minutes into the encounter.

114.    Finally, Weber communicated an unsupportable belief that Plaintiff had illegally entered the Accomplice's home when evidence shows Weber was aware that the Accomplice had given Plaintiff permission to enter her home as a landlord to fix a breaker.

115.    Plaintiff reminded Weber that he did have the right to enter the apartment with the tenant's permission, which she had freely given when he entered to access the basement to check the breakers.

*Emotional Distress*

116.    During the prolonged time that Plaintiff was in handcuffs, Martin and John Doe #1 attempted to place Plaintiff in the back of a police cruiser against his will.

117.    This happened when Plaintiff was still handcuffed, and Officers Martin and John Doe #1 repeatedly insisted that Plaintiff was not under arrest but merely detained.

118.    Plaintiff was suffering from earlier traumas involving police conduct including when Plaintiff was previously arrested years ago as a teenager and more recently from learning that Plaintiff's father died by suicide during a police encounter.

119.    Plaintiff repeatedly asked to be taken out of the police car, articulating his emotional distress.

120.    Plaintiff removed himself from the car, showing outward signs of emotional distress.

121.    Both Martin and John Does #1 each grabbed or put a hand firmly on Plaintiff attempting to stop him from leaving the car.

122.    At no time did Plaintiff attempt to leave the immediate area around the police car, he merely extracted himself from it and stood outside the car.

123.    Plaintiff was asked about and confirmed his emotional distress.

14

124.    Martin stated "I don't want to have to shove you in that car."

125.    Plaintiff again made these officers aware that he had called for assistance because Suspect locked him out of the garage.

126.    Martin then admitted that Accomplice likely made a false report but denied police were responsible for acting, and continuing to act, on false information.

127.    Plaintiff asked why the officers did not have names and badges.

128.    John Does #1 stated he was more comfortable with his name and badge not showing.

129.    Martin stated that there was a new policy that Oswego Police Officers do not have to display their name and badge.

130.    Martin asked Plaintiff if he has any suspects for who broke into the garage.

131.    The emotional distress Plaintiff experienced during the events of December 1, 2024 was compounded with everything that transpired thereafter, the emotional distress is continuing and ongoing up to the present day.

*The Cover Up Including Interference With Plaintiff's Healthcare*

132.    Martin interfered with Plaintiff's health care when Plaintiff was discussing his injuries by discussing Plaintiff's kicking in the door to his garage but omitting any discussion of his colleague having kicked Plaintiff's leg out from under him during the false arrest.

133.    Plaintiff was not walking with a limp before the false arrest but had a significant limp, rather needing to occasionally hop on his left leg to avoid putting weight on the injured right leg.

134.    The assault by officers was clearly more relevant to the medical treatment of Plaintiff but the Officers did not make the ambulance staff aware that they had violently assaulted Plaintiff.

135.    At about the same time Rupert made the suggestion to Plaintiff's mother that Plaintiff's injury was due to kicking in the door on the garage.  She was not informed of the assault.

136.    During that exchange the mother of Plaintiff asked if anyone could pursue charges against Suspect and Rupert told her no, even though it was clear that Suspect did not have the right to exercise dominion over the garage or its contents.

*Interference With Recording Evidence of Police Misconduct*

137.    The Officers were fully aware that Plaintiff was recording their activities because his rights were being violated and Plaintiff made it clear he intended to seek redress.

138.    The false arrest and assault of Plaintiff took place shortly after Plaintiff started recording.

139.    Weber seized Plaintiff's recording device moments after Plaintiff was assaulted and falsely arrested.

140.    Weber stopped the device from recording almost as soon as he seized it, preventing Plaintiff from continuing to gather evidence of the ongoing violations of his rights.

*Police Assistance With A Clearly Erroneous Civil Claim*

141.    It was clear early into the collaboration with Accomplice that Suspect had no right to exercise dominion over the garage or its contents and that Plaintiff had committed no crime.

142.    Police, with the assistance of the Accomplice and the Suspect, attempted to manufacture a crime with which to charge Plaintiff, while they kept him under false arrest, for the benefit of a clearly unsupportable civil claim by Suspect that Plaintiff did not have the right to access the assets of Plaintiff's father's estate.

143.    Police then failed and refused to arrest Suspect and Accomplice for their clearly illegal attempt to deprive Plaintiff and his sister of their property rights for the second time in days.

144.    When requested by Plaintiff's mother that Suspect be arrested for his clearly nefarious action, the Sergeant falsely claimed that it was necessary for an executor to be appointed before that estate could be protected from theft.

145. The police were admittedly in possession of enough information to know that Suspect had no right to the estate or its assets.

146. The police were therefore well aware that Suspect was engaging in attempted theft[3] of estate assets and that Accomplice was assisting him to do so.

147. It is clear that the Officers and Rupert were attempting to manufacture charges against Plaintiff, whilst refusing to pursue the perpetrators of attempts to steal from Plaintiff and his sister.

### First Claim For Relief
### 42 U.S.C. § 1983 (False Arrest, Fourth and Fourteenth Amendments)
### Against All Defendants

148. Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

149. At all times material to this complaint, Defendant CITY was acting through its police department and through Defendants, had in effect actual and/or *de facto* policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

150. At all times material to this complaint, Defendant CITY acting through its police department, and through the Individual Defendants, had in effect and/or *de facto* policies, practices, customs and usages of failing to properly train, screen, supervise and discipline employees and the individual defendants-Sgt./Police Officers, and of failing to inform the Individual

---

[3] N.Y. Penal Law 155.05 [2][a]. Additionally, Suspect and Accomplice could not have been acting in good faith pursuant to N.Y. Penal Law 155.15[1] because this was the second false report and the second attempt to deprive Plaintiff of his rights within days.

Defendants' supervisors of the need to train, screen, supervise and discipline said Defendants. The policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

151.    The Individual defendants were at all relevant times state actors and persons acting under color of state law within the meaning of 42 U.S.C. § 1983 because they are officers of the Oswego City Police Department.

152.    The Individual Defendants acted intentionally, with malice and knowing disregard for Plaintiff's constitutional rights, in falsely detaining, arresting, and imprisoning Plaintiff against his will.  Plaintiff was conscious of, and at no point consented to, the confinement by the Individual Defendants.

153.    The actions of the Individual defendants in falsely detaining, arresting, and imprisoning Plaintiff without warrant, reasonable suspicion or probable cause violated Plaintiff's Fourth amendment rights (as incorporated through the Fourteenth Amendment) to be free from unreasonable search and seizure, pursuant to 42 U.S.C. § 1983.

154.    The Individual Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, and of damages including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.  Accordingly, Plaintiff is entitled to compensatory and punitive damages.

**Second Claim For Relief**
**42 U.S.C. § 1983 (Use of Excessive Force)**
**Against All Individual Defendants**

155.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

156.    The Individual Defendants jointly and severally deprived Plaintiff of clearly established

18

rights secured to him under the United States Constitution specifically the Fourth Amendment right (as incorporated through the Fourteenth Amendment) to be free from use of excessive force against one's person.

157.    Weber's excessive force in kicking Plaintiff's right leg out from under him as he and, Martin held Plaintiff's arms, leading Plaintiff's right knee injury, was unreasonable and unnecessary under the circumstances.

158.    In depriving Plaintiff of his rights under the United States Constitution, the Individual Defendants acted under color of law in their respective capacities as Oswego City Police Officers, and their actions and omissions were conducted within the scope of their respective official duties or employment.  This deprivation under color of law is actionable and may be redressed by 42 U.S.C. § 1983.

**Third Claim For Relief**
**42 U.S.C. § 1983 (Failure To Intercede/Intervene)**
**Against All Individual Defendants**

159.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

160.    By their conduct and under color of state law, the Individual Defendants had opportunities to intercede on behalf of Plaintiff to prevent his false arrest, excessive force against him, the deprivation of his liberty without the due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

161.    These defendants' failures to interceded violated Plaintiff's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police office in or after 2023 would have believed that failing to intercede to prevent these

19

defendants from falsely arresting Plaintiff and using clearly excessive force against him, failing to conduct a constitutionally adequate investigation, causing Plaintiff to be arrested without probable cause and subjected to excessive force was lawful.

162.    Plaintiff was clearly innocent of any wrongdoing and clearly no crime had been committed when Plaintiff entered the structure belonging to his recently deceased father as next of kin.

163.    Plaintiff himself had, for the second time in two weeks, reported an attempt by a third party to exercise dominion and control over the assets of his deceased father's estate.  In doing so, Plaintiff followed the exact instructions given to him by police following the first incident.

164.    As a direct and proximate result of the individual defendants' actions, Plaintiff suffered and is suffering continuous damages.

**Fourth Claim For Relief**
**42 U.S.C. § 1985**
**(Civil Rights Conspiracy)**
**Against All Individual Defendants**

165.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

166.    Upon information and belief, the Individual Defendants agreed among themselves and with other individuals to act in concert to deprive Plaintiff of his clearly established rights, including but not limited to his right to be free from false arrest, free from use of excessive force not to be deprived of liberty without due process of law as guaranteed by the Fourth, Fifth, and Fourteenth Amendments.

167.    In furtherance of the conspiracy, the Individual Defendants engaged in and facilitated numerous overt acts, including, without limitation, assaulting Plaintiff, knowingly subjecting him to extreme emotional distress, false arrest, and excessive force and upon information and

belief, submitting false statements and manufacturing false evidence to hide their malfeasance.

168. The individual defendants conspired to deprive Plaintiff of needed medical care and fabricated and disseminated false accounts regarding the unjustified use of force as well as the source of Plaintiff's injuries.

169. The individual defendants' actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

170. As a direct and proximate result of the claims detailed above, plaintiff sustained the damages herein alleged.

### Fifth Claim For Relief
### 42 U.S.C. § 1986 (Failure to Prevent Civil Rights Conspiracy)
### Against All Individual Defendants

171. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

172. The Individual Defendants knew that acts previously mentioned, which violated Plaintiff's constitutional rights were about to be committed and they had the power to prevent or aid in preventing the commission of the same, but they neglected or refused to do so.

173. The Individuals Defendants are therefore each liable for Plaintiff's injuries under 42 U.S.C. § 1986.

174. The Individual Defendants' actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

175. As a direct and proximate result of the claims detailed above, plaintiff sustained the damages herein alleged.

**Sixth Claim For Relief**
**New York Civil Rights Law § 79-P**
**(Unlawful Interference With Recording Law Enforcement Activity)**
**Against the CITY as *respondeat superior* and All Individual Defendants**

176. Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

177. Plaintiff realized that he was erroneously being treated as a suspect by the Officers.

178. The CITY officers were "Officers" within the meaning of the meaning of NY Civil Rights Act § 79-P.

179. The CITY officers are "Officers" and were involved in "Law enforcement activity" within the meaning of NY Civil Rights Act § 79-P.

180. To preserve evidence, Plaintiff began to "Record" the encounter within the meaning of NY Civil Rights Act § 79-P.

181. Plaintiff was not under arrest or in the custody of the CITY officers when he began to record.

182. Approximately 55 seconds after Plaintiff began to Record the encounter, one of the officers announced an intention to detain Plaintiff.

183. The CITY officers had no right to detain Plaintiff as the CITY Police Department had previously given Plaintiff instructions on how to handle the particular circumstances, he found himself in and he had followed those instructions.

184. There was therefore no reasonable suspicion nor probable cause to suspect Plaintiff had committed any crime.

185. Plaintiff had already waited patiently for police to arrive after Plaintiff himself called for police assistance.

186. Recording the encounter was legally insufficient to give rise to any suspicion, let alone

reasonable suspicion or probable cause for arrest.

187.    Just before being assaulted and physically restrained by CITY Officers, Plaintiff indicated a willingness to answer the officer's questions somewhere outside of the rain, but not in police custody.

188.    This indication of willingness to assist the Officers with the Law Enforcement Activities provides additional evidence that there was no reasonable suspicion nor probable cause to detain or arrest Plaintiff.

189.    Plaintiff complied with each and every lawful request made by officers.

190.    Because there was no reasonable suspicion or probable cause, Plaintiff had the right decline being detained, restrained, or arrested.

191.    After assaulting and physically restraining Plaintiff, approximately one minute and thirty-three seconds after Plaintiff started to Record, Weber illegally searched for, and took physical possession of, the device Plaintiff was using to record the encounter.

192.    Within seven seconds of taking physical possession of the device Plaintiff was using to Record, and approximately one minute and forty seconds after Plaintiff started to Record, the officer stopped the recording.

193.    After searching Plaintiff, the Officers brought him to his feet.

194.    Weber expressed an interest in placing the recording device in Plaintiff's car.  Plaintiff requested that it be returned to his pocket, intending to continue recording as soon as he was released from handcuffs.

195.    Weber explicitly refused to return the recording device to Plaintiff.

196.    The physical detention was precipitated by Plaintiff's attempts to document the improper actions of the Officers and to prevent further violations of his civil rights.

23

197.    The physical detention was a pretext to taking control of the recording device.

198.    By turning off the recording device, Weber intentionally prevented Plaintiff from recording further Law Enforcement Activities during the encounter.

199.    By taking physical custody of the device Plaintiff was using to Record, Weber unlawfully seized the property of and the instrument used by Plaintiff to record the law enforcement activities without the consent of Plaintiff.

200.    By taking physical possession of the device, Weber seized recorded images of law enforcement activities recorded by Plaintiff without the consent of Plaintiff.

201.    The seizure of the device and recorded images was not done with approval from an appropriate court.

202.    In committing the acts alleged herein, each of the Individual Defendants were members and agents of the Oswego City Police Department, acting at all relevant times withing the scope of their employment.  The Defendant City of Oswego is accordingly liable as principal for all torts in violation of State Law committed by its agents

203.    The actions of the Individual Defendants were willful, malicious, oppressive, and/or reckless and were of such a nature that punitive damages should be imposed.

**<u>Seventh Claim For Relief</u>**
**New York State Law (Intentional Infliction Of Emotional Distress)**
**Against the CITY as *respondeat superior* and the Individual Defendants**

204.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

205.    Officers, who knew the identity of the Plaintiff as they engaged with him[4], treated Plaintiff

---

[4] Officers called Plaintiff by his first name during the encounter.

as a suspect based on actions by Plaintiff which were prescribed by police based on a nearly

identical false report a few days earlier.

206.    One or more of the Officers held a drawn electrical taser weapon on Plaintiff while Plaintiff

stood outside during moderate rainfall.

207.    The pavement upon which Plaintiff was standing was wet.

208.    Upon information and belief, Tasers use electrical current to inflict bodily harm on those who

are assaulted with them.

209.    Upon information and belief, Tasers can unexpectedly cause death to those who are assaulted

with them.

210.    Upon information and belief, the presence of water can make the electrical currents central

to the operation of Tasers more likely to cause serious injury or death.

211.    The Individual Defendants' actions throughout the encounter exceeded the bounds of what is

acceptable in civilized society.

212.    Moreover, Plaintiff verbalized and displayed clear signs of emotional distress which were

callously ignored by Martin and John Doe #1, who continued to intentionally subject Plaintiff

to such emotional distress.

213.    The conduct of the Individual Defendants as described above was extreme and outrageous

and constituted an abuse of their authority.  The Individual Defendants intended to cause, or

recklessly disregarded the risk that their conduct would cause, severe emotional distress to

Plaintiff.

214.    As a consequence of the Individual Defendant's conduct, Plaintiff has suffered ongoing and

severe emotional distress, affecting his income and his well-being as described herein.

215.    In committing the acts alleged herein, each of the Individual Defendants were members and

agents of the Oswego City Police Department, acting at all relevant times within the scope of their employment.  The Defendant City of Oswego is accordingly liable as principal for all torts in violation of State Law committed by its agents.

216.   Defendants' actions were the direct and proximate cause of Plaintiff's continued emotional distress.  Accordingly, Plaintiff is entitled to compensatory and punitive damages.

**Eighth Claim For Relief**
**New York State Law (False Arrest)**
**Against the CITY as *respondeat superior* and the Individual Defendants**

217.   Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

218.   The Individual Defendants acted intentionally, with malice and knowing disregard for Plaintiff's rights under New York state law, in falsely detaining, arresting, and imprisoning Plaintiff against his will.  Plaintiff was conscious of, and at no point consented to, the confinement by the Individual Defendants.

219.   The actions of the Individual Defendants in falsely detaining, arresting, and imprisoning Plaintiff without reasonable suspicion or probable cause violated Plaintiff's rights under New York State Law.

220.   In committing the acts alleged herein, each of the Individual Defendants were members and agents of the Oswego Police Department, acting at all relevant times within the scope of their employment.  The Defendant City of Oswego is accordingly liable as principal for all torts in violation of State Law committed by its agents.

221.   Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, and of damages including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set

forth above.  Accordingly, Plaintiff is entitled to compensatory and punitive damages.

**Ninth Claim For Relief**
**New York State Law (Assault and Battery)**
**Against the CITY as *respondeat superior* and the Individual Defendants**

222.    Plaintiff repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

223.    The Officers placed Plaintiff in apprehension of an immediate bodily contact with force.

224.    The Officers placed their hands on Plaintiff and otherwise subjected him to offensive touching and other bodily contact and caused Plaintiff's body to come into contact with harmful surfaces with force.

225.    This included holding Plaintiff's arms and kicking his leg out from under him causing him to contact the pavement with his knee hard enough to create a serious injury to his knee.

226.    Martin and John Doe #1 held Plaintiff's arm when he moved out of the police car in which he had been placed against his will during his unlawful detention following the false arrest that caused Plaintiff extreme emotional distress.

227.    In committing the acts alleged herein, each of the Individual Defendants were members and agents of the Oswego Police Department, acting at all relevant times within the scope of their employment.  The Defendant City of Oswego is accordingly liable as principal for all torts in violation of State Law committed by its agents.

228.    As a direct and proximate result of the Defendants' unreasonable and unlawful actions, the Plaintiff has suffered and continues to suffer substantial past and future damages, both compensatory and general, including, but not limited to, medical bills, loss of income, severe emotional distress, mental anguish, embarrassment, humiliation, and physical pain.

## **JURY DEMAND**

229.    Plaintiff requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby requests that the Court:

I. Invoke pendent party and pendent claim jurisdiction;

II. Issue judgment declaring that the conduct of the City of Oswego, through the Oswego City Police Department and as described in this Complaint, constitute violations of Plaintiff's rights under the U.S. Constitution, federal law, and the New York State Constitution, and New York state law;

III. Order injunctive relief to which Plaintiff is entitled;

IV. Empanel a jury;

V. Award Plaintiff compensatory damages in an amount to be determined by a jury;

VI. Award Plaintiff punitive damages arising from Defendant's actions;

VII. Award pre-judgment interest as allowed by law;

VIII. Order reasonable attorneys' fees and costs to be paid by Defendants pursuant to 28 U.S.C. § 2414 and 42 U.S.C. § 1988; and

IX. Grant such other and further relief as the Court deems just and equitable.

Dated:  New York, New York
        November 27, 2024

/s/ Anne LaBarbera
Anne LaBarbera Bar Number: 704360
*Attorney for Plaintiff*

**ANNE LABARBERA P.C.**
405 Lexington Ave, 9th Floor
New York, NY 10174
Telephone: 917-704-9759
Fax: 917-732-7756
Email: anne@alpc.law