UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEVON HILLMAN,

              Plaintiff,

         -v-                   5:24-CV-1448

THE CITY OF OSWEGO; OSWEGO
CITY POLICE DEPARTMENT;
SERGEANT TOM RUPERT;
INVESTIGATOR KEVIN
HADCOCK; OFFICER STEPHEN
WEBER; OFFICER JOSHUA MARTIN;
OFFICER JOHN DOE #1; SERGEANT
JOHN DOE #1; INVESTIGATOR JOHN
DOE #1; OFFICERS JOHN DOE #2-5;
DISPATCHER JOHN DOE,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:               OF COUNSEL:

ANNE LABARERA PROFESSIONAL   ANNE L. LABARBERA, ESQ.
   CORPORATION
Attorneys for Plaintiff
405 Lexington Ave
9th Floor
New York, NY 10174

FOTI HENRY PLLC          DANIEL CARTWRIGHT, ESQ.
Attorneys for Defendants     DAVID H. WALSH IV, ESQ.
403 Main Street, Suite 225
Buffalo, NY 14203

DAVID N. HURD
United States District Judge

## DECISION & ORDER

## I. INTRODUCTION

On November 27, 2024, plaintiff Devon Hillman ("Hillman" or "plaintiff") filed this nine-count civil action against defendants the City of Oswego (the "City"), Oswego City Police Department ("Oswego Police"), Sergeant Tom Rupert ("Sgt. Rupert"), Investigator Kevin Hadcock ("Investigator Hadcock"), Officer Stephen Weber ("Officer Weber"), Officer Joshua Martin ("Officer Martin"), Officer John Doe #1, Sergeant John Doe #1, Investigator John Doe #1, Officers John Doe #2-5, and Dispatcher John Doe (the "Dispatcher") (collectively the "defendants") for violations of his civil rights that occurred when he was arrested during a dispute that arose on December 1, 2023. Dkt. No. 1.

On February 3, 2025, defendants moved to dismiss plaintiff's complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Dkt. No. 13. The motion has been fully briefed and will be considered on the basis of the submissions and without oral argument. Dkt. Nos. 1, 13, 15, 18.

## II. BACKGROUND

On or around December 1, 2023, Hillman was present at a garage located in Oswego, NY (the "Garage"). Compl. ¶ 14. Hillman alleges the Garage was a part of his deceased father's estate, and that he was present that day to remove certain personal effects for estate-related matters. *Id*. But when he

arrived at the Garage, Hillman found an unfamiliar lock installed on the door that prevented his access. *Id*. ¶ 19. According to plaintiff, this was not the first time this had occurred—there was one prior incident where plaintiff arrived at the Garage to find an unfamiliar lock installed by a "then unknown [s]uspect [(the "Suspect")] attempting to take possession of and exercise dominion over the assets of the estate of [p]laintiff's deceased father." *Id*. ¶ 20. Plaintiff alleges the Suspect had an accomplice (the "Accomplice") call the Oswego Police to report plaintiff's presence, who subsequently arrived on the scene. *Id*. ¶ 21. The Accomplice is a woman who rented a home in Oswego, New York from plaintiff's father while his father maintained sole occupancy of the nearby Garage, which served as his residence prior to his death. *Id*. ¶ 25–27. Plaintiff contends that, after his father's death, the Accomplice perceived him as the *de facto* landlord while also engaging in a dispute with the father's estate due to a planned sale of the property she was renting.

When unspecified police officers from the Oswego Police responded to the first incident at the Garage, plaintiff contends the officers ordered the Accomplice "not to interfere with [p]laintiff's access to the garage."[1] *Id*. ¶¶ 21–22. Plaintiff also asserts the Suspect was also contacted by the Oswego

---

[1] Making all inferences in favor of the plaintiff, and as best as can be discerned from the complaint, the Garage was in close proximity to the residence the Accomplice leased from plaintiff's father. However, the backstory of the relationship between plaintiff and the Suspect, aside from his alleged intentions as to Hillman's father's estate and allegedly having placed one or more "foreign locks" on the garage, is entirely unclear.

Police and similarly directed not to impede plaintiff's access to the Garage, while plaintiff was instructed to contact the Oswego Police in the event that it happened again. *Id*. ¶¶ 23–24.

But on December 1, 2023, when Hillman observed the second foreign lock on the Garage, he became embroiled in a verbal dispute with the Accomplice regarding his right to access the garage. Compl. ¶¶ 32, 35. Plaintiff alleges he then proceeded to kick down the locked door to the access the Garage. *Id*. ¶ 33. Once he had kicked the door down, plaintiff feared the Accomplice would lodge a second police report. *Id*. ¶ 38. As a result, plaintiff contacted the Police to clarify what was happening and prevent further interference. *Id*. ¶ 39. Plaintiff was instructed by an Oswego Police Dispatcher to go sit in his car and wait for police to arrive, which he did. *Id*. ¶¶ 40–41.

A few minutes later, Officer Weber, Officer Martin, Officer John Doe #1, and Investigator Hadcock (the "Officers") arrived on the scene in police vehicles with lights and sirens activated. Compl. ¶¶ 43, 45. According to plaintiff, the Officers proceeded to surround plaintiff's car, with their tasers out and pointed towards him, demanding that he exit the vehicle, which he did. *Id*. ¶¶ 46–47. Plaintiff alleges when he exited his vehicle, he began recording the encounter with his cell phone out of concern that his civil rights were being violated, informing the Officers of his intention to record the encounter. *Id*. ¶¶ 50–51, 53–55. In addition, plaintiff contends that, upon

exiting his vehicle, he: (1) made no attempt to leave the scene; (2) repeatedly informed the Officers he had called in the report to the Oswego Police seeking assistance; (3) complied with every lawful request made by the Officers; (4) informed them he waited in his vehicle as directed by dispatch; and (5) requested the Officers contact dispatch to confirm this. *Id.* ¶¶ 56–61. Thereafter, Investigator Hadcock requested that plaintiff move closer to him. *Id.* ¶ 62.

When plaintiff complied and moved closer, Investigator Hadcock then "gave an unlawful demand" that Hillman turn around and be "detained." Compl. ¶¶ 62–63. At some point thereafter, Hillman contends the Officers "lunged towards him" and "assault[ed] him violently" before handcuffing him.[2] *Id.* ¶¶ 70–71. Specifically, plaintiff contends Officer Weber kicked across his body, hitting Hillman's right lower leg with enough force to throw the leg into the air before swiftly moving behind plaintiff, placing his knee on plaintiff's Achilles tendon, and pinning plaintiff's leg to the pavement. *Id.* ¶ 73. Hillman's right arm was restrained by Officer Martin as Officer Weber kicked plaintiff's right foot into the air who then pinned his left foot, all the while holding plaintiff's left arm. *Id.* ¶ 74.

---

[2] Notably, plaintiff does not specify whether this involved every defendant who was present at the scene or only certain of the defendants.

When plaintiff began to lose his balance, Officers Weber and Martin held up his arms until seconds before he landed on the pavement, at which point Hillman alleges that Investigator Hadcock grabbed his shoulder from his from the front. *Id.* ¶¶ 75–76. Plaintiff contends this combination of actions by the Officers was done to prevent him from using his arms to break his fall, and that his right knee ultimately struck the pavement with sufficient force to cause injury. *Id.* ¶¶ 76–78. The Officers then descended upon plaintiff, pinning him down and handcuffing him. *Id.* ¶ 79. Once Hillman was handcuffed, Officer Weber picked up plaintiff's mobile device and stopped the video recording. *Id.* ¶ 80.

Thereafter, the Officers conducted a custodial interrogation during which plaintiff repeatedly stated both that he had called the Officers as instructed after the first incident and that he had a legal right to enter the garage. Compl. ¶ 81. But Hillman contends the Officers refused to remove his handcuffs for approximately twenty-five minutes while also denying that he was under arrest. *Id.* ¶¶ 82–83. Hillman further alleges the Officers refused to confirm with Dispatcher John Doe that plaintiff ever called in a report. *Id.* ¶ 84.

Ten minutes into the encounter between Hillman and the Officers, plaintiff alleges Sgt. Rupert arrived at the scene. Compl. ¶ 85. Thereafter, plaintiff contends that Officer Weber asked Officer Martin and Officer John

Doe #1 to place Hillman into a squad car while Officer Weber followed Sgt. Rupert into the property near the Garage where the Accomplice resided. *Id*. ¶ 87. Then, plaintiff alleges overhearing the following interaction between Sgt. Rupert and Officer:

> SGT. RUPERT: "Are they just getting him outta here?"
>
> OFFICER WEBER: "We don't know what we have yet but he's being a complaining asshole."

*Id*. ¶ 88. Plaintiff contends he was the "him" and "he" being discussed, and that this suggests that the Officers held him in custody for revenge rather than on the basis of either probable cause or reasonable suspicion. *Id*. ¶ 89. Over the next ten to fifteen minutes, plaintiff alleges the Officers and Sgt. Rupert "worked together, at times with the active participation of the Suspect and Accomplice, to manufacture a legal theory upon which [p]laintiff could have been the perpetrator of a crime for entering the garage." *Id*. ¶ 92. Further, plaintiff alleges that "[a]t one point during this time [Sgt.] Rupert made a phone call to an unknown person and appeared to be brainstorming theories upon which [p]laintiff may have committed a crime." *Id*. ¶ 93.

At this same time, the Accomplice, a female, detailed the ongoing civil dispute between her, the Suspect, and Hillman at Investigator Hadcock's request. Compl. ¶ 94. After this, plaintiff contends that Investigator Hadcock called the Suspect by phone and "engaged in a polite discussion" in

an attempt to "establish a legal theory upon which the Suspect could press charges against [the p]laintiff." *Id.* ¶¶ 95–96.

Plaintiff alleges that Investigator Hadcock discussed and theorized with Accomplice what rights plaintiff might have in the Garage given his mother was not married to his father at the time of his death. Compl. ¶ 103. Despite plaintiff's contention that the Accomplice admitted to the Officers that she had previously given plaintiff permission to enter her property "for the legitimate purpose of checking the [circuit] breakers," he claims one of the Officers suggested to Accomplice that plaintiff had no right to access her apartment under any circumstances. *Id.* ¶ 104. Further, and unlike his own experience, plaintiff alleges that at no point did the Police treat the Accomplice as a suspect, point a taser at her, put her in handcuffs, detain her, or arrest her — even in light of her prior false report. *Id.* ¶ 105–108.

Plaintiff contends that, "in an attempt to manufacture a crime to justify their unlawful treatment of [him], the [Officers] theorized that [plaintiff] might have been stealing from [his father's] estate to prevent his sister from taking her part of the estate [. . .]." Compl. ¶ 109. But plaintiff alleges the officers "[e]ventually ran out of outrageous theories upon which they could justify their actions" and told the Accomplice that "[p]laintiff had done nothing wrong." *Id.* ¶ 110. Nevertheless, plaintiff contends that "the Accomplice was not treated as a suspect" for her false reporting or for

assisting the Suspect in taking possession of plaintiff's property in light of prior police orders not to interfere with plaintiff's right to it.  Compl. ¶ 111.

Plaintiff was treated in an ambulance for the knee injury he suffered while being handcuffed.  Compl. ¶ 112.  Police removed plaintiff's handcuffs approximately twenty-five to forty minutes after the initial encounter.  *Id.* ¶ 113.  Around this time, plaintiff contends Officer Weber "communicated an unsupportable belief" that plaintiff had illegally entered Accomplice's home despite Officer Weber knowing plaintif, as the *de facto* landlord of the property, had been permitted to do so for the purpose of fixing "a breaker."  *Id.* ¶ 114.

While plaintiff was handcuffed, he contends Officer Martin and Officer John Doe #1, though insistent he was not under arrest but merely detained, attempted to place him inside the back of a police cruiser against his will while he was handcuffed.  Compl. ¶¶ 116–17.  At or around this time, plaintiff alleges suffering from trauma symptoms stemming from both an earlier arrest as a teenager and recently discovering his father died by suicide during an encounter with police.  *Id.* ¶ 118.  Plaintiff contends he repeatedly asked Officers to be released from the police cruiser on the basis of his emotional distress before removing himself from the cruiser while displaying apparent indicators of emotional distress.  *Id.* ¶¶ 119–20.  Although Officer Martin and Officer John Doe #1 tried to stop plaintiff from

exiting the cruiser, Hillman nevertheless "extracted himself from" the cruiser and stood outside of it. *Id.* ¶¶ 121–22. Only then was plaintiff questioned by anyone about his trauma and distress. *Id.* ¶ 123. He also contends that Officer Martin stated: "I don't want to have to have to shove you in that car." *Id.* ¶ 124. Plaintiff reiterated he was the party who called the police for assistance. *Id.* ¶ 125. At this point, plaintiff contends Officer Martin admitted that the Accomplice had likely made a false report but "denied police were responsible for acting, and continuing to act, on false information." *Id.* ¶ 126.

Plaintiff then inquired why the officers did not have names or badges. Compl. ¶ 127. Officer John Doe #1 replied he was more comfortable without these identifiers showing, while Officer Martin indicated it was now Oswego Police Department policy that officers are not required to display their name and badge. *Id.* ¶¶ 128–29. Martin then asked the plaintiff if he had any suspects in mind who broke into the garage. *Id.* ¶ 130. Plaintiff contends these events contributed to his emotional distress. *Id.* ¶ 131.

Further, plaintiff alleges the health care he received after the incident was interfered with when Officer Martin omitted any discussion of his colleague kicking plaintiff's legs out from underneath him during the arrest. Compl. ¶ 132. In support, plaintiff contends that, before the arrest, he was not walking with a limp yet had a significant limp after the incident. *Id.* ¶ 133. While

plaintiff alleges this omission was not particularly impactful on the quality of his medical treatment, he asserts "the [Police] did not make the ambulance staff aware that they had violently assaulted [plaintiff]." *Id*. ¶ 134.  Around this same time, plaintiff contends that Sgt. Rupert informed his mother, who was present on the scene, that his injury was the result of having kicked in the Garage door.  *Id*. ¶ 135.  When plaintiff's mother asked Sgt. Rupert whether charges could be brought against the Suspect, plaintiff contends Sgt. Rupert replied that they could not.  *Id*. ¶ 136.

## III.  <u>LEGAL STANDARD</u>

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the level of speculation.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it

by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV. DISCUSSION

Plaintiff asserts that: (1) he was falsely arrested by the individual defendants in violation of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983 ("§ 1983"); (2) all individual defendants exercised the use of excessive force in violation of § 1983; (3) each individual defendant failed to intervene or intercede as to the constitutional violations plaintiff allegedly suffered in violation of § 1983; (4) each individual defendant engaged in a conspiracy to deprive him of his constitutional rights and engaged in overt acts to advance that conspiracy in violation of 42 U.S.C. § 1985 ("§ 1985"); (5) the individual defendants failed to prevent the alleged conspiracy against his constitutional rights in violation of 42 U.S.C. § 1986 ("§ 1986"); (6) the individual defendants interfered with a recording device—plaintiff's phone—which he allegedly used to record his interaction with the Officers immediately before the arrest in violation of New York Civil Rights Law § 79-p; (7) defendants conduct resulted in plaintiff's severe and ongoing emotional distress in violation of New York law; (8) he was falsely detained, arrested, and imprisoned in violation of New York law; and (9) all individual defendants committed assault and battery during his arrest and detention in violation of New York law.  Compl. ¶¶ 148–228.

Defendants now move to dismiss plaintiff's complaint pursuant to Rule 12(b)(6).  Dkt. No. 13.  In defendants' view: (1) plaintiff's official capacity claims against both the City and the Oswego Police are redundant and must be dismissed; (2) plaintiff's claims against the named defendants and Doe Defendants must be dismissed as the Officers had probable cause to arrest defendant and because "it is undisputed that Officer Longo" and the other Doe defendants acted in their official capacity when the incident occurred; (3) plaintiff fails to state a plausible claim for false arrest; (4) plaintiff fails to state a plausible excessive force claim; (5) plaintiff's conspiracy claims should be dismissed as conclusory; (6) in the event that plaintiff's federal causes of action are dismissed, the Court should decline to exercise supplemental jurisdiction over plaintiff's state law claims; (7) plaintiff's New York Civil Rights Law § 79-p claim should be dismissed because defendants' had probable cause—an affirmative defense—and, alternatively, plaintiff failed to mention this claim in their notice of claim; (8) plaintiff's intentional infliction of emotional distress ("IIED") claims should be dismissed because it is duplicative and was not plausibly alleged; (9) plaintiff's state law assault and battery and false arrest claims should be dismissed "given that the analyses for these claims mirror those of their federal counterparts"; and (10) plaintiff's punitive damages claim against the City and its officials be dismissed because municipalities are immune from punitive damages under §

- 13 -

1983, and such damages cannot be recovered from government officials sued in their official capacities.  Defs' Mem, Dkt. No. 13-1 at 8–21.[3]

### A. **Oswego Police**

As an initial housekeeping matter, Hillman has named the Oswego Police as a defendant.  Defendants contends that the Oswego Police is merely an administrative arm of the City and must be dismissed.  Defs.' Mem.13-1 at , Dkt. No.

Rule 17 governs the capacity of an individual or entity to sue or be sued in federal court.  FED. R. CIV. P. 17(b).  Further, Rule 17(b) requires that an entity have an independent legal existence. *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 382–83 (2d Cir. 2021) (citing *Brown v. Fifth Jud. Dist. Drug Task Force*, 255 F.3d 475, 477 (8th Cir. 2001) ("Rule 17(b)(3)(A) permits courts to imbue unincorporated associations and partnerships with the capacity to sue.  But this power does not extend to entities that lack legal existence.").

The question of whether an entity has an independent legal existence is resolved by reference to state law.  FED. R. CIV. P. 17(b)(3).  "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and,

---

[3]  Pagination corresponds to CM/ECF headers.

therefore, cannot sue or be sued." *Rose v. Cnty. of Nassau*, 904 F. Supp. 2d 244, 247 (E.D.N.Y. 2012) (citation omitted). Indeed, police departments are an administrative arm of the municipal corporations they serve. *See Faggins v. McDole*, 2025 WL 2933529 at *6 (N.D.N.Y. July 10, 2025) (citing *Loria v. Town of Irondequoit*, 775 F.Supp. 599, 606 (W.D.N.Y. 1990). Given this, a city's police department does not stand "separate and apart from the municipality" and cannot be sued separately. *Faggins*, 2025 WL 2933529 at *6. Thus, plaintiff's claims against defendant Oswego City Police Department will be dismissed with prejudice.

## B. Official Capacity Claims & Municipal Liability

Turning to the next issue, Hillman brings only a single § 1983 claim for false arrest against the City while also bringing each of his § 1983 claims against all individual defendants.[4] Defendant contends that § 1983 claims against officers in their official capacity are redundant because they constitute a suit against the municipality and are redundant.[5] Defs.' Mem., Dkt. No. 13-1 at 8. This is incorrect.

---

[4] More specifically, the operative complaint indicates that the first § 1983 claim for false arrest is asserted against *all* defendants while plaintiff's four other federal claims are only brought against "all individual defendants." By contrast, plaintiff's four state-law claims are also brought against the Officers as well as the City under a *respondeat superior* theory of liability.

[5] Defendant also requests certain individual capacity claims be dismissed because an "Officer Longo" and certain Doe defendants acted solely in their official capacities. However, having reviewed defendants' motion papers, it is entirely unclear to this Court who Officer Longo is or what role he played in this matter. Further, given defendants have not pointed to any law to support their argument, that request will be denied.

To bring a § 1983 claim for municipal liability, *i.e.*, a *Monell* claim, a plaintiff "must plausibly allege" that "an official policy or custom" existed which "caused him to be denied a constitutional right." *Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 138 (N.D.N.Y. 2024) (cleaned up).  In the context of § 1983, municipalities are considered to be persons.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Further, under § 1983, a municipality *cannot* be held vicariously liable for the constitutional torts of their employees nor liable under a theory of *respondeat superior*.  *Id.* at 691 (emphasis added); *see also Faggins v. McDole*, 2025 WL 2933529 at *6 (N.D.N.Y. July 10, 2025).

It is instead "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.  "[T]he Supreme Court has recognized that *Monell* liability may be established through: (1) a policy formally adopted and endorsed by the municipality; (2) actions taken by policymaking officials that caused the particular deprivation alleged; (3) practices by subordinate officials that are not expressly authorized but are so widespread and consistent that policymakers must have been aware of them;

or (4) a failure by policymakers to train or supervise that amounts to deliberate indifference to the rights of those who come into contact with the inadequately trained or supervised municipal employees." *Thomas*, 711 F. Supp. 3d at 139 (quoting *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 729 (N.D.N.Y 2020) (cleaned up)). "[B]oilerplate statements that county employees were acting in accord with a municipal policy, with no facts to support these statements, are not sufficient to support a *Monell* claim." *Id.* (quoting *Forrest v. Cnty. of Greene*, 676 F. Supp. 3d 69, 76 (N.D.N.Y. 2023).

While plaintiff need not "show that the municipality had an explicitly stated rule or regulation, a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Raymond v. Bunch*, 136 F. Supp. 2d 71, 77 (N.D.N.Y. 2001) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991) (cleaned up). "'The inference that a policy existed may, however, be drawn from circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction, or evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges' that its agents were violating citizens' constitutional rights." *Raymond*, 136 F. Supp. 2d at 77 (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61–62 (2d Cir.1998) (cleaned up)).

By contrast, "to establish individual liability in a § 1983 action, plaintiffs must show that [an] official, acting under color of state law, caused the deprivation of a federal right." *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 686 (2d Cir. 2005) (quoting *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)).[6]

Upon review, Hillman has failed to plausibly allege a *Monell* claim against the City.  Rather, plaintiff's scant allegations against the City are limited to boilerplate language.  Compl. ¶¶ 149–50.  First, plaintiff asserts that "[a]t all times material to this complaint, [d]efendant [City] was acting through its police department and through [d]efendants, had in effect actual and/or *de facto* policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein."  Compl. ¶ 149.  Next, Hillman contends the City "had in effect and/or *de facto* policies, customs, and usages of failing to properly train, screen, supervise, and discipline employees and the individual defendants […] and of failing to inform the Individual Defendants' supervisors of the need to train, screen, supervise and discipline said Defendants."  Compl. ¶ 150.

---

[6] As stated *supra*, aside from plaintiff bringing a § 1983 false arrest claim against both the City and all other individual defendants, each of plaintiff's remaining claims based in federal law are solely directed towards "all individual defendants."

Hillman's claims against the City set forth no factual allegations to satisfy the requirements set forth in *Monell*.⁷ As stated *supra*, boilerplate statements that the City's employees acted in accordance with a municipal policy, absent any supporting facts to describe the policy, are insufficient to support a *Monell* claim. *Forrest*, 676 F. Supp. 3d at 76. The Court also finds Hillman's allegations as to the City to be entirely conclusory and devoid of any specific facts from which a plausible allegation of municipal liability under *Monell* could be found. Accordingly, defendants' motion to dismiss plaintiff's § 1983 claim for false arrest as to the City will be granted.

## C. **Doe Defendants**

As an initial matter, while plaintiff does bring certain allegations regarding unnamed defendant Officer John Doe #1 as to the second incident at the Garage, plaintiff's complaint contains no allegations directed toward defendants Sergeant John Doe #1, Investigator John Doe #1, Officers John Doe #2-5, and Dispatcher John Doe (collectively the "Doe Defendants"). Because plaintiff's complaint fails to allege that the Doe Defendants were "personally involved" in any actionable misconduct, those defendants must be

---

⁷ Although Hillman's allegations include language that roughly aligns with certain of the *Monell* requirements—*i.e.*, asserting that a policy was in effect which led to unconstitutional conduct and/or that there was a failure by policymakers to train or supervise employees 0which led to an infringement of plaintiff's constitutional rights—those allegations are still limited to bare conclusions that are entirely unsupported by facts. Compl. ¶¶ 149–50

dismissed without prejudice.  *Darby v. Greenman*, 14 F.4ᵗʰ 124, 130 (2d Cir. 2021).

### D. **§ 1983 Claims**

Next, Hillman asserts three claims under § 1983 against the Officers for false arrest, use of excessive force, and failure to intervene.  Defendants now seek to dismiss each of these claims arguing plaintiff has failed to state a plausible claim for which relief can be granted.

§ 1983 itself is not a source of substantive federal rights, but rather a statutory mechanism to sue state actors where they are personally involved in deprivations of constitutional rights.  *Whitton v. Williams*, 90 F. Supp. 2d 420, 427 (S.D.N.Y. 2000); *see also Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 489 (N.D.N.Y. 2017).  "To establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation."  *Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (quotation omitted).

State actors are considered "personally involved" under § 1983 when they either participate directly in or when they fail to intervene to prevent a constitutional deprivation.  *See Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016); *see also Martinez v. City of N.Y.*, 564 F. Supp. 3d 88, 106 (E.D.N.Y. 2021) ("Police officers have an affirmative duty to intervene to protect the

constitutional rights of citizens from infringement by other law enforcement officers in their presence.") (cleaned up).

Indeed, Hillman's § 1983 claims are premised on theories of both direct participation and a failure to intervene. Plaintiff brings claims against all individual defendants for: (1) false arrest; (2) excessive force; and (3) failure to intervene. Compl ¶ 148–170. Defendants maintain they were not personally involved in, nor failed to intervene in order to prevent, any of the purported constitutional violations. Defs.' Mem. at 13–15.

## 1. **False Arrest**

Turning to plaintiff's first § 1983 claim, it will be construed as a claim for false arrest in violation of his Fourth Amendment right to be free from unreasonable search and seizure against the Officers. Plaintiff contends that the Officers lacked either probable cause or his consent when they arrested him during the second encounter at the Garage. Rather, plaintiff alleges that, upon their arrival, the Officers immediately surrounded his vehicle with tasers in hand, that he was arrested by the Officers even though he contacted the Oswego Police about this incident and was merely complying with a dispatcher's instructions—to sit in his car and await the Oswego Police's arrival. Compl. ¶¶ 24, 41–42, 46–47.

Defendants contend the false arrest claim must be dismissed because plaintiff's own complaint establishes the defendants' probable cause. Defs.'

Mem. at 9–10.  In support, defendants argue probable cause is found where police respond to calls from home dwellers regarding "potential activity" on their property, and that in such circumstances, police officers possess the requisite reasonable belief of an offense to warrant finding probable cause.[8] *Id.*  Defendants claim the Accomplice, who was the tenant of a residence proximate to the Garage, properly called the police on the plaintiff when he entered the property.[9]  *Id.*

"A § 1983 false arrest claim is grounded in the Fourth Amendment right of an individual to be free from unreasonable seizures." *LaFever v. Clarke*, 525 F. Supp. 3d 305, 329 (N.D.N.Y. 2021) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "To establish a claim under § 1983 for false arrest a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *LaFever*, 525 F. Supp. 3d at 329 (cleaned up).

---

[8]  In advancing their argument that the Officers had probable cause when they detained Hillman based on a reasonable belief that a burglary was being attempted, defendants notably rely on *Henry v. N.Y.C.*  2003 WL 22077469 at **1–2 (S.D.N.Y. 22077469); *see also* Defs' Mem., Dkt. No. 13-1 at 9–10.  But *Henry* resolved a motion for summary judgment and the Court's reasoning relied heavily on testimony, whereas this is a pre-answer motion.

[9]  As addressed *infra*, defendants also point to body cam footage accompanying their motion where plaintiff admits to attempting to kick open the Garage door as further support that the police had probable cause to arrest Hillman when they arrived on the scene.  *Id.*

Confinement is considered "privileged" if the arresting officer had probable cause or is otherwise protected under the doctrine of qualified immunity. *Simpson v. City of N.Y.*, 793 F.3d 259, 265 (2d Cir. 2015). Additionally, police officers have probable cause to arrest where they have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 494 (N.D.N.Y. 2017) (internal quotations and citations omitted).

Upon review, plaintiff has plausibly alleged that the Officers directly participated in in his arrest. Compl. ¶ 70–79. Hillman has alleged that Officer Martin, Officer Weber, and Investigator Hadcock worked together to hold plaintiff's arms, remove him from his feet, and ultimately bring him to the ground for the purpose of handcuffing him. *Id.* Plaintiff has also plausibly alleged that, after being handcuffed, he was placed into a police cruiser against his will by Officer Martin and Officer John Doe #1. *Id.* ¶ 87. Further, after being handcuffed, plaintiff plausibly alleged that he remained in handcuffs for at least twenty-five minutes while also being told by one or more of the Officers that he was not under arrest. *Id.* ¶¶ 82–83.

Plaintiff has also plausibly alleged that the Officers did not have probable cause. Hillman alleged that there was a prior incident at the Garage where

Oswego Police were called to the scene, where they instructed the Accomplice for filing a false report and instructed plaintiff to contact them if there were any further disputes. *Id.* ¶¶ 20–24. Plaintiff also plausibly alleges that, when the second dispute at the Garage arose, he contacted the Oswego Police as instructed, wherein he was advised to go sit in his vehicle and wait for the police to arrive on the scene. *Id.* ¶¶ 39–41. Plaintiff further alleges that he complied with that instruction, but that the Officers nevertheless surrounded his vehicle with tasers drawn immediately upon arriving at the scene. *Id.* ¶¶ 40–47.

Accordingly, plaintiff has plausibly alleged a § 1983 false arrest claim as to the Officers, and defendants' motion to dismiss this claim will be denied.

## 2. **Excessive Force**

Turning to plaintiff's second claim, Hillman brings an excessive force claim pursuant to § 1983 against the Officers. Compl. at ¶¶ 155–58. Plaintiff contends his constitutional rights were violated where, during his arrest, Officers Weber and Martin, acting under the color of state law, each held one of his arms before Officer Weber kicked his right leg out from under him causing him to fall and suffer a knee injury. *Id.* Defendants argue the officers were acting in the scope of their employment and cannot be held liable. Defs' Mem., Dkt. No. 13-1 at 6–7. In addition, defendants ask the Court to consider the body camera footage they have included with their

motion, arguing it conclusively disproves plaintiff's excessive force claims.

Defs.' Mem. at 11–12.  In support, defendants cite a past decision where this

Court's own review of video footage supported dismissal of the excessive force

claim.  *Id.* at 12; *see also LaFever*, 525 F. Supp. 3d at 335.[10]

Courts may consider video footage at the motion to dismiss stage when the

footage is referenced in the complaint and "[k]ey allegations in the complaint

rest[ ] on the [...] video."  *Santiago v. City of Rome*, 2025 WL 553347, at *3

(N.D.N.Y. Feb. 19, 2025) (cleaned up).  But courts in this Circuit have

repeatedly refused to consider video evidence not attached to, referenced in,

or mentioned in the complaint in deciding a motion to dismiss.  *Id.* at *3

(citing *O'Brien v. City of Syracuse*, 2023 WL 6066036, at *6, (N.D.N.Y. Sep. 8,

2023)) (collecting cases).

As an initial matter, plaintiff has made no allegations of excessive force as

to any defendants aside from the Officers.[11]  Turning to plaintiff's claims as to

Officer Weber, Officer Martin, and Investigator Hadcock, Hillman contends

that prior to being detained and handcuffed, the Officers "lunged towards

him" and "assault[ed] him violently."  Compl. ¶ 70.  Specifically, plaintiff

---

[10]  Notably, however, the matter defendants point to did not involve the resolution of a pre-answer motion as is the case here.  *See generally LaFever*, 525 F.Supp.3d 305.

[11]  Further, while plaintiff did not make in specific allegations regarding Officer John Doe #1 in the context of his excessive force allegations, he has plausibly alleged that this defendant was present at the scene before, during, and after his arrest.  However, in making all inferences in favor of plaintiff, the Court will not dismiss plaintiff's claims against Officer John Doe #1 at this juncture.

contends that Officer Weber kicked across plaintiff's body, hitting Hillman's right lower leg with force sufficient to throw his right leg into the air before swiftly moving behind plaintiff and place his knee on plaintiff's Achilles tendon and pinning it to the pavement. Compl. ¶ 73. Thereafter, Hillman's right arm was restrained by Officer Martin as Weber kicked plaintiff's right foot into the air and pinned his left foot, simultaneously holding onto to plaintiff's left arm. Compl. ¶ 74.

When plaintiff started to lose his balance and fall, Officers Weber and Martin allegedly held his arms until seconds before landing on the pavement, at which point Investigator Hadcock allegedly grabbed plaintiff's shoulder from the front. Compl. ¶¶ 75, 76. Plaintiff contends this was all done to prevent the use of his arms to break a fall, and that his right knee ultimately struck the pavement with enough force to injure him. Compl. ¶¶ 76–78. Plaintiff alleges the Officers then descended upon plaintiff, pinning him down and handcuffing him. Compl ¶ 79. Plaintiff contends he injured his knee and was later walking with a limp as a result. Compl. ¶¶ 76–78, 133. He received medical attention after his arrest while remaining handcuffed. Compl. ¶¶ 112.

Defendants request the Court consider the body camera video footage they have included with their motion. However, no mention of body camera footage or video evidence is either attached to, referenced in, or mentioned in

plaintiff's complaint.  Thus, defendants' request that this Court consider it at this stage will be denied.

Plaintiff has plausibly alleged an excessive force claim pursuant to § 1983 against the Officers.  Specifically, Hillman contends that the Officers: (1) grabbed him and kicked his leg out from under him; (2) injured his knee during the handcuffing when his leg hit the ground; (3) caused an injury that resulted in him walking with a limp; and (4) injured him despite his compliance with their commands and absent any resistance.  Compl. ¶¶ 70–78, 133.  Accordingly, defendants' motion to dismiss plaintiff's § 1983 excessive force claim will be denied as to the Officers but granted without prejudice as to all other defendants.

### 3. **Failure to Intervene**

Plaintiff also brings § 1983 claims against the Officers for their failure to intervene as to both false arrest and excessive force, arguing that defendants had opportunities to intervene but failed to do so.  Compl. ¶¶ 159–164. Defendants did not squarely address this claim, instead focusing on why plaintiff failed to make out plausible § 1983 claims for false arrest and excessive force.  Defs.' Mem. at 9–15.

Nevertheless, to bring a failure to intervene claim, a plaintiff must plausibly allege: "(1) the defendant had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the defendant's position

would have known that the plaintiff's constitutional rights were being violated; and (3) the defendant did not take reasonable steps to intervene." *Cornell v. Vill. of Clayton*, 691 F. Supp. 3d 608, 620 (N.D.N.Y. Sept. 13, 2023).

Hillman has successfully pleaded a failure to intervene claim as to false arrest. He has alleged that the Officers were present both prior to and during his arrest. *Supra*. In sum, plaintiff's allegations support a finding that the Officers should have known that his rights were being violated because he was being arrested without probable cause, and his complaint does not contain any allegations that any Officer made any attempt to intervene on plaintiff's behalf, particularly in light of his allegation that he remained in handcuffs for at least twenty-five minutes. *Id.*

Similarly, with respect to plaintiff's failure to intervene as to excessive force claim, plaintiff has plausibly alleged a constitutional violation when he sustained an injury while being arrested by the officers. *Supra*. And he has alleged that the Officers were present before and during the arrest but does not allege that any of the Officers took any steps to intervene. *Id.* To the contrary, Hillman alleges sustaining an injury during the arrest that ultimately required medical attention. Compl. ¶¶ 132–33. Accordingly, defendants' motion to dismiss plaintiff's § 1983 failure to intervene claim as to false arrest will be denied. *Supra*.

### D. <u>Conspiracy Claims</u>

Plaintiff's fourth and fifth causes of action allege a civil rights conspiracy against all individual defendants pursuant to § 1985 and a failure to prevent a civil rights conspiracy pursuant to § 1986.  Compl. ¶¶ 165–175.  Defendants contend both claims should be dismissed because plaintiff has offered nothing beyond bare conclusions that defendants entered into an agreement to conspire against him.

#### 1. <u>§ 1985 Civil Rights Conspiracy</u>

*First*, Hillman contends that defendants acted in concert to deprive him of his civil rights and either engaged in or facilitated numerous overt acts such as false arrest, emotional distress, excessive force, and submitting false evidence to do so.  Compl. ¶¶ 165–170.

To bring a conspiracy claim under § 1985(3), a plaintiff must allege: "1) a conspiracy; 2) for the purpose of depriving ... any person ... of the equal protection of the laws[;] ... and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Cooper v. N.Y.*, 2020 WL 1140500, at *5 (N.D.N.Y. Mar. 9, 2020) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006)).  In addition, "[v]ague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a conspiracy claim under either § 1983 or § 1985(3)."  *Trombley v. O'Neill*, 929

F. Supp. 2d 81, 97 (N.D.N.Y. 2013) (citing *Kiryas Joel All. v. Vill. of Kiryas Joel*, 495 F. App'x 183, 190–91 (2d Cir. 2012) (internal citations omitted). Rather, plaintiffs "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Trombley*, 929 F.Supp.2d. at 97 (quoting *Kiryas Joel All.,* 495 F. App'x. at 190) (cleaned up).

Plaintiff's complaint contains no allegations, either express or tacit, that defendants entered into an agreement to conspire to violate plaintiff's civil rights. Although plaintiff makes certain conclusory statements that specific defendants appeared to be colluding with or conspiring with the Accomplice and Suspect to manufacture a claim against him, plaintiff has not brought any specific allegations to support a finding that a purported conspiracy, aimed at interfering plaintiff's civil rights, existed. To the contrary, plaintiff's vague and conclusory assertions that defendants collaborated with the Accomplice and/or the Suspect to manufacture a claim against him are insufficient. Accordingly, plaintiff's § 1985 claims against the individual defendants will be denied without prejudice.

## 2. § 1986 Failure to Prevent Civil Rights Conspiracy

Plaintiff also brings a claim pursuant to § 1986 alleging defendants failed to prevent a civil rights conspiracy where they knew acts which violated

plaintiff's constitutional rights were about to take place and had the power to prevent them but refused to do so.  Compl. ¶¶ 171–175.

§ 1986 claims may proceed only where there is "a viable conspiracy claim under [§] 1985." *Feacher v. Intercontinental Hotels Grp.*, 563 F. Supp. 2d 389, 401 (N.D.N.Y. 2008) (quoting *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994)).  As plaintiff's § 1985(3) were dismissed *supra*, their § 1986 claims necessarily must also be dismissed.

### E.  <u>Plaintiff's State-Law Claims</u>

Plaintiff also brings four state-law claims against the City and the Officers for: 1) unlawful interference with recording law enforcement activity in violation New York Civil Rights Law § 79-P; 2) IIED; 3) false arrest; and 4) assault and battery.  Compl. ¶¶ 176–200.

As a threshold matter, given that plaintiff's excessive force and failure to intervene as to excessive force claims survive at this pre-answer stage, the Court retains subject matter jurisdiction over these claims at this stage.  28 U.S.C. § 1367(a).  These claims will be addressed in turn.

### 1.  <u>Unlawful Interference with Recording Law Enforcement</u>

*First*, defendants move to dismiss plaintiff's state-law claim pursuant to New York Civil Rights Law § 79-p against the City and the Officers.  Defs.' Mem. at 16–18.  Plaintiff alleges that the Officers and the City violated his right to record police activity pursuant to New York's Right to Monitor Act,

Civil Rights Law § 79-p.  Compl. ¶¶ 176–203.  Defendants argue they had probable cause to arrest plaintiff in order to investigate a potential burglary. Defs.' Mem. at 18.  In the alternative, plaintiff argues that the Notice of Claim, which they have attached as an exhibit to their motion, Dkt. No. 13-2, failed to plead this claim or facts to support their claim.

The Right to Monitor Act provides that "[a] person not under arrest or in the custody of a law enforcement official has the right to record law enforcement activity." N.Y. Civ. Rts. L. § 79-p(2).  It also gives rise to a private cause of action for "unlawful interference with recording a law enforcement activity" when: (1) "a person demonstrates that he or she exercised or attempted to exercise the right established in subdivision two" and (2) "an officer acted to interfere with that person's recording of a law enforcement activity." *Id.* at (3).  An officer acts to interfere with the right to where they "intentionally prevent[s] or attempt[s] to prevent that person from recording law enforcement activity." *Id.* at (3)(i).

Plaintiff has plausibly alleged that, when the police arrived and ordered him to exit his vehicle, he exited and began recording the incident with his cellular phone.  Compl. ¶¶ 55, 64, 176–183.  Plaintiff also contends that it was only after he began to record the incident that an Officer stated they were going to detain him.  *Id.* ¶ 182.  Plaintiff alleges the Officers proceeded to seize him, bring him to the ground, handcuff him, and stop the recording.

Dkt. No. 13–2.  Thus, plaintiff has plausibly alleged that an officer acted to interfere with his recording of law enforcement activity.

Even further, a review of plaintiff's Notice of Claim, included with defendants' motion as an exhibit, suggests that defendants' contention is in error.  Notice of Claim, Dkt. No. 13-2.  A review of this exhibit clearly shows factual allegations that "one of the officers found a device on the ground belonging to claimant [who] was filming the incident.  *Id*. at 3.  The officer then took possession of the device without permission or authority and stopped the recording just after it recorded an officer admitted that his actions were motivated by answers obtained from the custodial interrogation." *Id*. at 3.  The Notice of Claim also states "the [c]laimant will assert all other damages allowed by New York State laws and statutes as a result of the conduct of the Respondents, their detectives, police officers, supervisors, and employees[.]" *Id*. at 4.

Accordingly, the Court finds plaintiff has plausibly alleged that his recording of the incident was interfered with by law enforcement, and that proper notice was provided to defendants in the Notice of Claim.  Accordingly, defendants' motion to dismiss this claim will be denied.

## 2. **IIED Claim**

*Next*, defendants move to dismiss plaintiff's IIED claims against the City and the Officers.  Defs.' Mem. at 18.  Defendants contend that well-settled

public policy dictates that IIED claims against government entities are barred and that Hillman's IIED claims against the Officers should fail since they are duplicative of his false arrest claims and

The state-law tort of IIED has four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *Bender v. City of N.Y.*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 121 (1993)).  Under New York law, the bar is high for alleging conduct that is "extreme and outrageous" enough to constitute IIED.  *Id.*  (citing *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983)) (("'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized [society]'").[12]  Finally, under New York law, it is well-settled public policy that IIED claims against government entities are barred.  *Endemann v. City of Oneida*, 2020 WL 1674255 at *7, n. 2 (N.D.N.Y. Apr. 6, 2020) (quoting *Frederique v. Cnt. of Nassau*, 168 F. Supp. 3d 455, 483 (E.D.N.Y. 2016)).

---

[12]  In the alternative, plaintiff's IIED claim against the City must be dismissed as it is well-settled under New York Law that public policy bars IIED claims against governmental entities. Endemann v. City of Oneida, 2020 WL 1674255 at *7, n.2 (N.D.N.Y. Apr. 6, 2020) (citing *Frederique v. Cnt. of Nassau*, 168 F. Supp. 3d 455, 483 (E.D.N.Y. 2016)).

Upon review, the Court finds that plaintiff has failed to plausibly allege any of the requisite elements of an IIED claim as to any of the Officers.  *See generally* Compl.  Namely, the complaint is devoid of any allegations of conduct that would be considered "extreme or outrageous."  Lastly, plaintiff's IIED claim against the city is barred as a matter of well-established public policy.  Accordingly, defendants' motion to dismiss plaintiff's IIED claims against the Officers and the City will be granted.

**3. <u>False Arrest & Assault and Battery</u>**

*Finally*, defendants move to dismiss plaintiff's state-law claims for false arrest and assault and battery.  Defs.' Mem. at 20–21.  As to both claims, defendants' sole contention is that the New York legal standard for both claims under are effectively the same as their analogs under § 1983, *i.e.*, false arrest and excessive force, respectively.

"Under New York law, a plaintiff claiming false arrest must show, *inter alia*, that [defendants] intentionally confined him without his consent and without justification."  *Weyant*, 101 F.3d at 852 (collecting cases).  A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause […] is substantially the same as a claim for false arrest under New York law.  *Id*.

Similarly, federal excessive force claims [under § 1983] and state-law assault and battery claims against police officers are nearly identical. *Graham v. City of N.Y.*, 928 F. Supp. 610, 624 (citing *Humphrey v. Landers*, 344 F.App'x. 686, 688 (2d Cir. 2009)) ("[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical.") (cleaned up).

Finally, employers, including the State, can be held vicariously liable for torts, including intentional torts, committed by employees acting within the scope of their employment. *Rivera v. State*, 34 N.Y.3d 383, 389 (2019) (collecting cases).

Given plaintiff has plausibly alleged § 1983 claims for false arrest and excessive force claim for the reasons stated *supra*, his state-law false arrest and assault and battery claims must survive at this pre-answer stage. Accordingly, defendants' motion to dismiss will be denied as to Hillman's state-law false arrest and assault and battery claims.

**F.  Punitive Damages against *the* City**

Defendant next argues that plaintiff cannot bring punitive damages claims against the City.  Defs.' Mem. at 21.  Plaintiff did not address this argument in their reply brief.  *See* Pl's. Reply, Dkt. No. 18.  Defendant is correct.  § 1983 does not permit the recovery of punitive damages against a

municipality.  *Downing v. Town of Cicero*, 2025 WL 641570 at \*17 (N.D.N.Y. Feb 27, 2025) (citing *Gilead Cmty Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 103 (2d Cir. 2024) (cleaned up).  New York Courts similarly disallow such recovery, instead finding municipalities immune from punitive damages.  *See Carney v. City of Utica*, 148 A.D.2d 927 (1989) (collecting cases); *see also City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[W]e find that considerations of history and policy do not support exposing a municipality to punitive damages for the bad-faith actions of its officials.")  Accordingly, insofar as plaintiff requests punitive damages from the City, that request will be rejected.

## V.  CONCLUSION

In sum, plaintiff has plausibly alleged § 1983 claims against the Officers for false arrest, excessive force, and failure to intervene as to both false arrest and excessive force.  In addition, Hillman has plausibly alleged state-law claims against the Officers for unlawful interference with recording law enforcement, false arrest, and assault and battery.  However, plaintiff has failed to plausibly allege §§ 1985 and 1986 conspiracy claims or a state-law IIED claim against the Officers.

As to the City, plaintiff has failed to plausibly allege a § 1983 claim for municipal liability.  However, plaintiff has plausibly alleged a theory of *respondeat superior* against the City for the state-law claims against the

Officers.  Plaintiff's request for punitive damages from the City will be rejected.  All other defendants will be dismissed from this matter for the reasons stated *supra*.

Therefore, it is

ORDERED that

1.   Defendants' motion to dismiss plaintiff's complaint (Dkt. No. 1) is GRANTED in part and DENIED in part.

2.   Defendants' motion to dismiss plaintiff's claims against the Oswego Police is GRANTED;

3.   Defendants Sergeant John Doe #1, Investigator John Doe #1, Officers John Doe #2-5, and Dispatcher John Doe are *sua sponte* dismissed without prejudice;

4.   Defendants' motion to dismiss plaintiff's § 1983 false arrest claim against the City is GRANTED;

5.   Defendants' motion to dismiss plaintiff's § 1983 false arrest claim against the Officers is DENIED;

6.   Defendants' motion to dismiss plaintiff's § 1983 failure to intervene as to false arrest claim against the Officers is DENIED;

7.   Defendants' motion to dismiss plaintiff's § 1983 excessive force claim against the Officers is DENIED;

8.  Defendants' motion to dismiss plaintiff's § 1983 failure to intervene as to excessive force claim against the Officers is DENIED;

9.  Defendants' motion to dismiss plaintiff's § 1985 conspiracy against civil rights claim against the Officers is GRANTED;

10.  Defendants' motion to dismiss plaintiff's § 1986 failure to prevent conspiracy against civil rights claim against the Officers is GRANTED;

11.  Defendants' motion to dismiss plaintiff's New York Civil Rights Law § 79-p claim against the City and the Officers for unlawful interference with recording law enforcement is DENIED;

12.  Defendants' motion to dismiss plaintiff's IIED claims against the City and the Officers is GRANTED;

13.  Defendants' motion to dismiss plaintiffs' state-law false arrest claims against the City and the Officers is DENIED;

14.  Defendants' motion to dismiss plaintiffs' state law assault and battery claims against the City and the Officers is DENIED;

15.  Plaintiff's request for punitive damages from the City is DENIED;

16.  The City and the Officers are ordered to file an answer to plaintiff's remaining claims on or before January 20, 2026.

The Clerk of the Court is further directed to terminate the pending motion and set deadlines accordingly.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  January 6, 2026
        Utica, New York.